1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT PYKE,

        Plaintiff,

   v.

ARCADIS, US INC. ET AL.,

        Defendant.

_____/

No. C 11-01279 CRB

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
SUMMARY JUDGMENT**

    Plaintiff Robert Pyke brought suit against his former employer, Defendant ARCADIS, US Inc., and his former supervisor, Defendant Larry Roth, (collectively, "Defendants"), in connection with his termination. See generally Compl. (dkt. 1). Defendants now move for summary judgment on all of Plaintiff's claims. See generally MSJ (dkt. 34). As explained below, the Court GRANTS the Motion for Summary Judgment as to all claims but one part of Plaintiff's section 1983 claim. The Court DENIES Plaintiff's request for additional discovery.

I.    **BACKGROUND**

    A.    **Plaintiff is Hired by ARCADIS**

    Plaintiff is an experienced geotechnical engineer with expertise in water resource management. Pyke Depo (Campbell Decl. (dkt. 35) Ex. A) at 10:13-15. Defendant ARCADIS is the United States arm of one of the largest environmental consulting companies

1    in the world.  Barrett Decl. (dkt. 36) ¶ 3.

2        In the Summer of 2008, Plaintiff received a call from a friend, who mentioned that

3    ARCADIS was looking to hire someone to help develop ARCADIS's Northern California

4    water management practice.  Pyke Depo at 19:24-20:19.  Plaintiff expressed interest in the

5    position, id. at 20:24, and went on to have three meetings with ARCADIS leadership (one in

6    Lafayette, California, a "double" meeting in New Orleans, Louisiana and Denver, Colorado,

7    and a third in Atlanta, Georgia) about how Plaintiff would fit into the organization, id. at

8    25:14-27:15.  At the third meeting, although there was no specific discussion of salary or

9    benefits, Plaintiff responded to a question about how long he expected to continue working

10   by saying: "10-15 years.  People who do the kind of work that I do actually hit their stride,

11   let's say, in the range of 65 to 80 years because in part your expertise is based on experience,

12   and by that time, you've acquired more experience."  Id. at 39:15-40:1.  The details of

13   Plaintiff's employment offer were outlined in a telephone call following the third meeting,

14   id. at 28:6-12, 42:7-43:1, and Plaintiff received a formal offer letter dated July 22, 2008,

15   id. at 44:22-25; Campbell Decl. Ex. B.[1]  Plaintiff testified that the letter did not "guarantee"

16   that he could work for 10-15 years, although that was his expectation.  Pyke Depo at 64:2-

17   67:8.

18       **B.    Plaintiff's Initial Work with ARCADIS**

19       Plaintiff began work for ARCADIS on August 4, 2008.  Id. at 21:4.  Plaintiff worked

20   on a variety of projects for different ARCADIS clients in California, New Orleans, and

21   elsewhere, though he focused a substantial percentage of his time on ARCADIS's efforts to

22   build its water resources practices in California.  Kamber Decl. (dkt. 37) ¶ 5.  In April 2010,

23   ARCADIS hired Larry Roth to manage the development of ARCADIS's water resources

24   practice, and Plaintiff began reporting to him.  Id. ¶ 7.

25

26   _____

27       [1] The offer letter stated, among other things, that "ARCADIS is an 'at-will employer' and it is
     agreed and understood that acceptance of this offer does not create an expressed or implied contract for
     an indefinite or fixed term of employment.  In addition, by accepting this offer, you agree that no other
28   representations, warranties, or promises about the position and compensation have been agreed upon
     other than what is set forth in writing in this letter."  Campbell Decl. Ex. B.

**United States District Court**
For the Northern District of California

1    In July 2010, the Delta Stewardship Council ("DSC" or "the Council"), a state agency

2    focused on water management in California, entered into a major consulting engagement

3    with ARCADIS.  <u>See generally</u> Macaulay Decl. (dkt. 38).  DSC initially hired a company

4    called CH2M Hill to assist it in developing a comprehensive Delta Plan, but that selection

5    created a controversy because CH2M Hill was a contractor on the ongoing preparation of the

6    "Bay Delta Conservation Plan" ("BDCP"), which the DSC was evaluating for possible

7    inclusion in the new overall Delta Plan.  <u>Id.</u> ¶¶ 3-4.  In response to that controversy, DSC

8    decided to engage a second, "independent" consultant with no prior involvement with the

9    BDCP to review the BDCP on the DSC's behalf.  <u>Id.</u> ¶ 4.  Indeed, the press release

10   announcing that ARCADIS had won the contract to be the independent consultant to the

11   DCS stated in part, "The Council selected ARCADIS, U.S. because of the firm's

12   qualifications and because it has not been involved with the BDCP process."  Macaulay

13   Decl. Ex. 2.

14   In reviewing ARCADIS's bid to be an independent consultant to the DSC, Terry

15   Macaulay, the Supervising Sanitary Engineer for the DSC, asked the CH2M Hill project

16   manager to review a list of proposed ARCADIS personnel for prior BDCP involvement.

17   Macaulay Decl. ¶ 5.  CH2M Hill identified two individuals – Mark Tompkins and Jeremy

18   Thomas – as having been involved in the development of the BDCP when they had

19   previously worked for CH2M Hill.  <u>Id.</u>  Macaulay informed ARCADIS that Tompkins and

20   Thomas could not be involved in the project.  <u>Id.</u>; Macaulay Decl. Ex. 1 (July 6, 2010 letter

21   from Macaulay to Plaintiff: "These two individuals therefore do not meet the BDCP

22   independence qualifications for this contract, and we request that you remove them from

23   your team.").  Plaintiff agreed that Tompkins and Thomas would be excluded, initially.

24   <u>See</u> Macaulay Decl. ¶ 6 ("[Plaintiff] agreed to proceed with the contract without Mr. Thomas

25   and Mr. Tompkins, and I understood the matter was closed.")[2]; Pyke Depo at 104:4-5 ("I

26   indicated that we'd leave them off the initial submittal.").  Plaintiff did not tell Macaulay that

27

28   _____
     [2] Plaintiff's objection to this evidence is denied, as the statement is admissible to show
     Macaulay's state of mind.

1   he intended to ask for them to be added back to the team at a later point.  Pyke Depo at

2   104:6-11.

3       About a week later, after the contract with ARCADIS was finalized, Plaintiff emailed

4   Macaulay attempting to re-open the issue of including Tompkins and Thomas as

5   subcontractors on the ARCADIS team.  Macaulay Decl. ¶ 7.  Plaintiff spelled out the reasons

6   that Thomas and Tompkins "created no conflict," and why they were important to the team.[3]

7   Pyke Decl. (dkt. 41-1) ¶ 8.  Plaintiff used the phrase "I insist" in arguing that Thomas and

8   Tompkins be added to the team.  Id.  Macaulay considered the issue "long closed" and did

9   not respond to Plaintiff's email or communicate with him further about that staffing issue.

10  Macaulay Decl. ¶ 7.  Macaulay contends that "[t]he project proceeded effectively without the

11  involvement of Mr. Tompkins and Mr. Thomas whose roles were subsumed by other

12  members of the team."  Id.  Plaintiff does not directly dispute that point, although he states in

13  his declaration that "[t]he inclusion of Mark Tompkins and Jeremy Thomas on the team was

14  necessary to the success of this portion of the publicly funded project," Pyke Decl. ¶ 3.

15      Macaulay states in her declaration that, as she began to work with ARCADIS on the

16  BDCP review, she "almost immediately became concerned with [Plaintiff's] approach to

17  project management.  His communication style was abrupt and dismissive to me and other

18  members of the DSC staff, and he had a view of the ARCADIS project that exceeded the

19  scope" of what ARCADIS had been asked to do.  Macaulay Decl. ¶ 9.[4]  On August 8, 2010,

20

21      [3] Plaintiff details Thomas's and Tompkins's importance in his declaration.  "The reason that
22  Thomas and Tompkins were critical to the team's ability to serve the Council and the public in our
    review of the BDCP, is that a key element of the BDCP is the 'effects analysis' which attempts to
23  predict the effect of the planned actions on a variety of listed species.  Without a compelling effects
    analysis, the state and federal agencies cannot grant 'incidental take permits' which would allow water
24  exports from the Delta for a period of 50 years without the threat of being shut down for non-compliance
    with the state and federal endangered species acts.  The primary goal of the BDCP is not so much to
25  construct a peripheral canal or alternate conveyance around, under or through the Delta, as it is simply
    to obtain these incidental take permits.  While ARCADIS had personnel with general qualifications in
26  this area, we lacked specific experience on relevant types of effects analysis.  That is why Thomas and
    Tompkins were included in the team in the first place."  Pyke Decl. ¶ 3.

27      [4] Plaintiff objects to this evidence as lacking foundation, hearsay and inadmissible opinion
28  testimony.  See P Objections (dkt. 41-3).  This objection is sustained as to the last clause only; although
    Macaulay cannot testify about Plaintiff's perception of ARCADIS's role, she can testify as to her own
    interactions and perceptions of Plaintiff.

1   Plaintiff sent Macaulay a draft DSC staff report that Macaulay believed needed a "major

2   edit" and "demonstrated a lack of awareness of the intended audience and purpose for the

3   report, and did not reflect the staff's direction or instruction for its contents." Id. ¶ 10; Ex. 3.

4   Plaintiff sent a revised draft, acknowledging that the tone of the report was "a little bold" but

5   stating, "this is the way it is." Id. Plaintiff sent another draft, which Macaulay felt "also

6   reflect[ed] an inflexible and strident tone," and Macaulay concluded that Plaintiff "could not,

7   or would not, draft the staff report consistent with the direction and expectations of the DSC

8   staff" on whose behalf the report was written. Macaulay Decl. ¶ 10.

9            **C.     Plaintiff is Removed As Client Contact**

10           On August 10, 2010, Macaulay contacted Roth and "requested that . . . Roth take over

11   the point-of-contact responsibilities with the DSC in order to ease the frustration that

12   [Macaulay] was experiencing with communications and attention to the staff's instructions."

13   Id. ¶ 11. As Roth describes the call, "Macaulay was concerned about [Plaintiff's]

14   communication style and his insistence that the DSC staff acquiesce to his demands

15   regarding project issues such as staffing, participation in meetings, and execution of the

16   work. In particular, [Macaulay] expressed her frustration that [Plaintiff] seemed unable or

17   unwilling to follow her instructions and incorporate her review comments" on the report.

18   Roth Decl. (dkt. 39) ¶ 39. Roth agreed to take over as point-of-contact temporarily, and they

19   agreed that Plaintiff would remain on the team in a technical role. Macaulay Decl. ¶ 11.

20   Macaulay sent Roth her correspondence with Plaintiff about the report, and Roth "promptly

21   made additional changes to address [Macaulay's] comments," and she was "very happy with

22   the revised version that he provided on the following day." Id. ¶ 12.

23           Roth called Plaintiff on August 10, 2010 and informed him that the DSC had

24   requested that Plaintiff be removed as point-of-contact, and that Roth had honored that

25   request, at least temporarily. Roth Decl. ¶ 8. Plaintiff reacted defensively, and hung up on

26   Roth. Id. Roth then sent Plaintiff a follow-up email, reiterating, "Our client has asked that

27   you be removed as spokesman for ARCADIS for the DSC project. I tried to explain the

28   situation to you, to inform you of the client's concerns, and to seek your help in defining a

path forward.  Unfortunately, our phone call was prematurely truncated."  Roth Decl. Ex. 2.
The email then instructed Plaintiff: "Do not attempt to reach the Council, either Council
members or staff, until we have discussed this fully and determined the proper path forward."
Id.  Plaintiff replied that he had talked to Peter, another member of the team, and "we agreed
that as a temporary work-around we can name Peter as the contact person."  Id.  Plaintiff did
not respond to Roth's attempts to contact him by telephone or email over the next two days.
Roth Decl. ¶ 10.

On August 11, 2010, Roth received an email from Peter, forwarding him a message
that Plaintiff had sent to Macaulay, which had not copied Roth, and which had attached a
new draft of the staff report.  Roth Decl. Ex. 3 (August 11, 2010 letter from Plaintiff to
Macaulay, others: "I am attaching a final draft of the suggested staff report. . . . I understand
that [Roth] is attempting to do yet another draft but I wanted to be sure that you get
something that is reasonably final today.").  Plaintiff had instructed a technical writer to edit
both his report and Roth's version separately.  Pyke Depo. at 149:15-151:5.  Plaintiff
explained in his declaration that he proceeded with his version of the report because it was
due by August 11, 2010.  Pyke Decl. ¶ 15.

Also on August 11, 2010, Plaintiff sent a long email to an executive at ARCADIS,
complaining about his conflict with Roth, and stating that Roth had been "hired by Dennis
Kamber without checking his references and in spite of the warning I gave Dave Thomas."
Campbell Decl. Ex. D at RP 25.  It discussed Macaulay's contact with Roth and speculated
that "she had tagged [Roth] as a patsy that she could manipulate to the benefit of herself and
CH2MHill, although not to the benefit of the Council or the people of California."  Id. at RP
26.  It recounted that "basically [Roth] agreed unilaterally to replace me as the point of
contact" and that "[t]here are many nuances . . . that [Roth] is unaware of."  Id.  It asked
whether Roth could "unilaterally take over running this very significant project with [sic?]
consultation with anyone in operations, like me, the senior IN operations person . . . ?"  Id. at
RP 27.  And it continued, "Even if it were proper in terms of company policy for [Roth] to
take over execution of the project, he is simply not up to the job."  Id.  The email went on to

**United States District Court**
For the Northern District of California

1   question Roth's past experience, to say that he "does not understand" that Macaulay "is a

2   pawn of" CH2M Hill, and that Roth would "argue back in some way," like a woman or a

3   child, if they told him everything "[they] knew."  Id. at RP 27-28.  It also stated: "I have no

4   big problem with [Roth] continuing to serve as our man in Sacramento except that he has

5   done essentially nothing in the months that he has been with the company, cannot reasonably

6   be expected to do anything significant and is a waste of shareholders funds."  Id. at RP 28.

7   Roth emailed Plaintiff on August 12, 2010, recounting that the DSC staff had insisted

8   that Plaintiff to be removed as point-of-contact, that Plaintiff had hung up on Roth, and that:

> Rather than trying to work through this critical situation collaboratively, you forged ahead completing a draft report independently, which was not consistent with the client's expectations.  You engaged a technical editor to review this document, and you sent it off to her without copying me.  Subsequently you shortcut the process by sending the document directly to the client without completing the editing and the technical review, and without seeking my approval.  I ask that you do not contact the client under any circumstances, or work on the project without specific direction from me.

14  Campbell Ex. H at ARCADIS 06.  Plaintiff responded to Roth and cc-ed other ARCADIS

15  executives, explaining,

> When I discontinued our conversation on Tuesday I had just said that I needed to talk to other people about this situation. . . . Amongst other things I am seeking clarification on whether it was your prerogative to unilaterally take over running this project without consulting anyone-else, particularly in Operations.  I may be mistaken but I am under the impression that your role with the company is primarily to develop new opportunities, not to interfere in operations.  It is much more up to Dennis and Steven than it is me to assess your progress on developing new opportunities but it seems to me that you have much yet to accomplish in that regard.

21  Id. at ARCADIS 04.  Plaintiff continued: "I don't want to get too personal but it was not only

22  improper but naive for you to accept [what Council staff said to you] at face value and not

23  check the facts or talk to anyone-else before caving in.  Your caving on this question was not

24  necessary . . . and was not in the best interests of the team that Peter and I have put together,

25  or the stockholders and the employees of ARCADIS in general."  Id. at ARCADIS 05.

26  Plaintiff shared his theory that the effort to "move [him] aside" would "reduce [ARCADIS's]

27  influence and remove any threat to CH2MHill's position of influence," and that "[i]f the

28  legislature finds out that we are caving to staff and CH2MHill pressure, that will

United States District Court
For the Northern District of California

immediate[ly] reverse the reprieve from criticism that the Council has gotten by hiring us."

Id.  Plaintiff forwarded this email to additional people later in the day.  Id.  at ARCADIS 04.

On August 13, 2010, Plaintiff emailed an ARCADIS executive again, stating that Roth had been "a failure in his two jobs after leaving CH before joining ASCE (from which he was in fact forced out[)]" and that Roth:

> has a history of getting in scrapes like this, notwithstanding the initial impression that he is a congenial and even nice person.  The wide spread impression is that he is just not quick enough to grasp what is going on and then reacts in a childish way when one tries to explain the facts to him.

Kamber Decl. Ex. 2.  He warned that it "has already caused derisive comments about ARCADIS from people who know both of us when they find out that I am reporting to [Roth]."  Id.  Plaintiff then forwarded this email to additional people.  Id.

### D.    Plaintiff is Terminated and Brings Suit

Executives at ARCADIS decided to fire Plaintiff on August 17, 2010.  Kamber Decl. ¶ 13.  ARCADIS Senior Vice President Dennis Kamber stated in his declaration that the termination was particularly based on Plaintiff's "series of insubordinate and inappropriate communications with his supervisor Mr. Roth and other upper level management employees regarding Mr. Roth and other employees since August 10, and his insubordinate conduct toward Mr. Roth by disregarding and disobeying Mr. Roth's instructions" about contacting the Council.  Id.  Kamber made several unsuccessful attempts to meet with Plaintiff between August 17, 2010 and August 23, 2010.  Kamber Decl. ¶ 15.

In the meantime, on August 18, 2010, Plaintiff emailed a water resources legislative aide, Tina Cannon Leahy, and informed her that he had been "removed as the project manager . . . at the request of Terry Macaulay and was not involved in the completion of the document that purports to be an ARCADIS report."  Campbell Decl. Ex. E.  He continued, "No formal reason has been given for my removal but I believe that the root cause of jousting between Terry and myself was that I have continued to push for the retention of Mark Tompkins and Jeremy Thomas on the team, in part because we know that the request for their exclusion was driven by CH2M and in part because they add value to the team."  Id.

United States District Court
For the Northern District of California

1    On August 22, 2010, Plaintiff sent another email to an ARCADIS executive, asking

2 him "to investigate the ethics and behavior of my supervisor Larry Roth."  Campbell Decl.

3 Ex. G.  On August 23, 2010, he emailed the same executive, noting that his Blackberry

4 "appeared to have been taken off the grid," and stating his concern "that Dennis Kamber

5 might be trying to terminate me to silence my criticism (not so much of him but of Larry

6 Roth, who Dennis hired without proper vetting)."  Id.

7    Kamber ultimately informed Plaintiff of his termination on August 23, 2010.  Kamber

8 Decl. ¶ 15; Pyke Decl. ¶ 22.[5]

9    Plaintiff brought suit against ARCADIS and Roth in March, 2011.  See

10 generally Compl.  He brings seven causes of action: (1) Fraud and Deceit; (2) Breach of

11 Contract; (3) Breach of the Covenant of Good Faith and Fair Dealing; (4) Wrongful

12 Termination in Violation of Public Policy; (5)  Wrongful Termination in Violation of Statute

13 (Government Code Section § 12650 and Labor Code Section 1102.5); (6) Negligence Per Se;

14 (7) Violation of Plaintiff's Civil Rights under 42 U.S.C. § 1983.[6]  Id.

15 **II.    LEGAL STANDARD**

16    Summary judgment is proper when "the movant shows that there is no genuine

17 dispute as to any material fact and the movant is entitled to a judgment as a matter of law."

18 Fed. R. Civ. P. 56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on

19 which a reasonable fact finder could find for the nonmoving party, and a dispute is

20 "material" only if it could affect the outcome of the suit under governing law.  See Anderson

21 v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A principal purpose of the summary

22 judgment procedure "is to isolate and dispose of factually unsupported claims."  Celotex

23 Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  "Where the record taken as a whole could not

24

_____

25    [5] Kamber actually recalls the date as August 24, 2010, Kamber Decl. ¶ 15, but because it is
immaterial to this motion, Defendants accept Plaintiff's August 23, 2010 date.  See Reply (dkt. 43) at
26 6 n.3.

27    [6] The first page of the Complaint also lists an eighth cause of action, for conspiracy to violate
civil rights under 42 U.S.C. § 1985, but the body of the Complaint does not include such a claim, and
28 the parties do not discuss it in their papers.  Therefore the Court concludes that there are only seven
causes of action.

1    lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for

2    trial.'"  Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

3    **III.    DISCUSSION**

4          Defendants move for summary judgment on all counts.  See generally MSJ. Plaintiff

5    appears to oppose summary judgment on two counts, explicitly abandons one count,[7] and

6    seeks additional discovery on the remaining counts under Federal Rule of Civil Procedure

7    56(d).  See Opp'n at 1.  This Order will first address the counts for which Plaintiff seeks

8    additional discovery, and then address the counts on which Plaintiff opposes summary

9    judgment.

10         **A.       COUNTS ONE, TWO, THREE AND SIX AND PLAINTIFF'S REQUEST**

11                   **FOR ADDITIONAL DISCOVERY**

12                   **1.       Counts One, Two and Three**

13         Plaintiff states in his Opposition that he "acknowledges that the facts developed to

14   date do not support his claims for fraud in the inducement and breach of contract" – Counts

15   One and Two – and so he does not oppose Defendants' arguments as to those claims.

16   See Opp'n at 3.  Although that statement does not reference Count Three, for breach of the

17   covenant of good faith and fair dealing, that Count is dependent on Count Two, see Fonteno

18   v. Equitable Real Estate Inv. Mgmt., Inc., No. 94-3158, 1996 WL 209716, at *7 (April 24,

19   1996) ("There can be no duty of good faith arising from the implied covenant where there is

20   no underlying contract"), and so presumably Plaintiff also acknowledges that the facts

21   developed to date do not support it.  Plaintiff does argue, however, that he should be

22   permitted to take additional discovery to develop information to support his fraud, breach of

23   contract and breach of the implied covenant of good faith and fair dealing claims, as well as

24   to "develop evidence of disparate treatment of [Plaintiff], as a result of his complaints to

25

26

27              [7] Plaintiff explicitly abandons his Fifth Cause of Action, for Wrongful Termination in Violation
     of Government Code § 12650 and Labor Code § 1102.5, "because the facts as developed in discovery
28   do not support them."  See Opp'n at 1.  This Order therefore does not address the Fifth Cause of Action,
     and the Court enters judgment for Defendants on it.

United States District Court
For the Northern District of California

1   Macaulay, versus other employees who allegedly engaged in insubordination but were not

2   terminated." See Opp'n at 11-12.[8]

3       Plaintiff contends that he is entitled to additional discovery because he "has been

4   denied an opportunity to pursue discovery with respect to his claims" by Defendants. Id. at

5   12. Plaintiff states that he served two sets of special interrogatories to Defendants and the

6   second set of responses he received contained only objections. Id. He also states that he

7   inquired about scheduling depositions[9] and that Defendants' counsel was uncooperative,

8   eventually refusing to produce any deponents on the date noticed. Id.[10] Plaintiff states that

9   Defendants have therefore not provided the discovery that would have supported his first

10  three claims, elucidated how Defendants' policy of pre-termination corrective action was

11  applied to others, and revealed what level of bonus Plaintiff was promised. Id. The Court

12  finds Plaintiff's arguments unavailing.

13      Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for

14  specified reasons, it cannot present facts essential to justify its opposition, the court may: (1)

15  defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or

16  to take discovery; or (3) issue any appropriate order." Fed. R. Civ. P. 56(d). Although

17  Plaintiff has submitted a six-paragraph declaration by counsel, see Henry Decl., it lacks

18  detail, and does not point "to any specific relevant information that further discovery might

19  help [him] obtain," see In re Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, 1145 (N.D. Cal.

20  2002). Plaintiff has not specified whose depositions he believes are necessary and what facts

21  each would reveal. The only specific facts that Plaintiff identifies are (1) how Defendants'

22

23      [8] Plaintiff does not state which cause of action any evidence of disparate treatment would
    support.

24

25      [9] Although Plaintiff's brief does not state whose depositions he sought, his counsel's declaration
    attaches a letter listing Roth, Macaulay, Jim Barrett, Michael Carroll, Kamber, John Hensley and
26  Wijsman.   Henry Decl. (dkt. 41-2) Ex. C (March 2, 2012 letter from Stephen Henry to Stacey
    Campbell).

27      [10] A letter from Defendants' counsel to Plaintiff's counsel states, "Defendants are willing to
    work with you on scheduling the individuals Plaintiff seeks to depose, but will not be able to
28  accommodate the schedules (April 6, 9 and 10, 2012) and location you provided." Henry Decl. Ex. E
    (April 4, 2012 letter from Campbell to Henry).

United States District Court
For the Northern District of California

1   policy of pre-termination corrective action was applied to others, and (2) what level of bonus

2   Plaintiff was promised.  Opp'n at 13.  But disparate treatment is irrelevant to a breach of

3   contract or fraud claim, and Plaintiff has already testified that he was not guaranteed a

4   bonus.[11]  See Pyke Depo. at 55:8-57:1.  Plaintiff has thus failed to submit an affidavit with

5   "particular facts expected from the movant's discovery" that would actually justify an

6   opposition on these claims.  See Brae Transp. Inc. v. Coopers & Lybrand, 790 F.2d 1439,

7   1443 (9th Cir. 1986).

8        Even if the declaration was more specific, however, additional discovery would be

9   futile as to the fraud, breach of contract, and breach of the implied covenant of good faith and

10  fair dealing claims.  As to the fraud claim, Plaintiff gave a deposition in this case and

11  submitted a declaration, and has not identified any misrepresentation by Defendants that

12  would support a fraud claim.[12]  Rather, Plaintiff admitted in his deposition that he was not

13  promised or guaranteed any particular term of employment.  Pyke Depo. at 63:17-65:24

14  (Plaintiff testifies that it was his expectation that he would work for ARCADIS for 10-15

15  years but that he had no guarantee of that).  To the extent that the fraud claim is based on a

16  representation as to a bonus, Plaintiff testified only that he recalled reading that he was

17  eligible for an "annual bonus of up to 40 percent of salary," not that he was guaranteed to be

18  paid a bonus of 40 percent of his annual salary.  See Pyke Depo. at 55:8-57:1.  Thus, it is

19  hard to imagine how any testimony by an ARCADIS witness could supply a

20  misrepresentation upon which Plaintiff relied, about which he has not testified.  Similarly, as

21  to the contract claims, where Plaintiff executed an integrated offer letter which set forth the

22  terms of his employment and specified that he was an at-will employee, see Campbell Decl.

23  Ex. B, and where Plaintiff testified that he understood what "at-will" meant and that he was

24  not guaranteed any term of employment, id. at 64:2-67:8, it is hard to imagine what

25

26        [11] Even if someone orally promised Plaintiff a bonus, his offer letter stated: "by accepting this
    offer, you agree that no other representations, warranties, or promises about the position and
    compensation have been agreed upon other than what is set forth in writing in this letter."  See Campbell
27  Decl. Ex. B.

28        [12] Plaintiff's Opposition brief states that Plaintiff "continues to contend that he is owed a bonus
    for his work in 2010," Opp'n at 12, but he points to no evidence supporting his contention.

testimony from an ARCADIS employee could transform his at-will employment into one for

termination only in accordance with stated "policies and practices," <u>see</u> Compl. ¶¶ 27-28.

Accordingly, the Court DENIES any further discovery and GRANTS summary

judgment to Defendants on the first three counts.

### 2.     Count Six

Plaintiff does not explicitly drop his Sixth Cause of Action, for Negligence Per Se, but

he also does not address it in his Opposition.  In the Complaint, that cause of action alleges

"the Defendant ARCADIS violated a statute or regulation, as described above."  Compl. ¶

49.  The "as described above" language presumably refers to the Fifth Cause of Action,

alleging violations of Government Code § 12650 and Labor Code § 1102.5.  <u>See id.</u> ¶¶ 42-

47.  But Plaintiff explicitly abandoned that cause of action.  <u>See</u> Opp'n at 1.  Accordingly the

Court concludes that Plaintiff has also abandoned his Sixth Cause of Action, and GRANTS

summary judgment to Defendants on it.

### B.     COUNT FOUR: WRONGFUL TERMINATION

Defendants also move for summary judgment on Plaintiff's fourth cause of action,

wrongful termination in violation of public policy.  MSJ at 17-21.  Plaintiff presumably

opposes summary judgment on this cause of action (he does not explicitly abandon it or ask

for further discovery on it), but he does not address it in his Opposition, which makes the

Court's task more difficult.  In the Complaint, the fourth cause of action alleges without any

detail "that Plaintiff's termination was wrongful because it was in violation of the public

policy of the State of California and the United States in that Plaintiff's termination was in

<u>retaliation for Plaintiff's opposing and reporting illegal and unconstitutional activity,</u> as

described in preceding allegations."  Compl. ¶ 39 (emphasis added).

Defendants argue initially that Plaintiff's claim for wrongful termination fails as a

matter of law because he does not establish that his termination implicated a specific

statutory or constitutional provision.  <u>See</u> Reply at 7 (citing <u>Green v. Ralee Eng'g Co.</u>, 19

Cal. 4th 66, 75-80 (Cal. 1998) (explaining that such a limitation "recognizes an employer's

general discretion to discharge an at-will employee without cause")).  Indeed, the Complaint

1   does not identify a statutory or constitutional provision violated by Plaintiff's termination,

2   Plaintiff fails to supply that information in his Opposition brief, and, in response to an

3   interrogatory seeking "each statute, rule or regulation which [Plaintiff] allege[s] was violated

4   by ARCADIS," Plaintiff responded that he "does not allege that ARCADIS violated a

5   statute, rule, or regulation." See Campbell Decl. Ex. I at 7-8.  However that same response

6   goes on to state that ARCADIS is "liable under a Section 1983 claim for retaliatory

7   termination," as well as statutes that Plaintiff subsequently abandoned in his Opposition.

8   See id.; Opp'n at 1.  Assuming for the moment that section 1983 sufficiently describes the

9   conduct alleged here, it would support public policy sufficient for a tortious discharge claim,

10  see Grinzi v. San Diego Hospice Corp., 120 Cal. App. 4th 72, 80-81 (2004) ("To support

11  public policy sufficient for a tortious discharge claim, the First Amendment free speech

12  provision must delineate the fundamental policies at issue").

13         More problematic is the substance of the claim.  Plaintiff nowhere defines what

14  "illegal and  unconstitutional activity" he clams to have opposed and reported, but the Court

15  assumes that he is referring to his removal as client contact based on his insistence that

16  Tompkins and Thomas be part of the ARCADIS team.[13]  See Compl. ¶ 39.  The "opposing"

17  part of the claim is presumably based on the emails Plaintiff sent following his removal, and

18  the "reporting" part of the claim is presumably based on his having reported his removal to

19  Leahy, the legislative aide.  See Compl. ¶ 16 (Defendants "terminat[ed] Plaintiff after he

20  reported [Macaulay's] actions to Tina Leahy, an advisor to Assemblymember Jared

21  Huffman[,] on August 18, 2010.").[14]  Both reporting and opposing bases of the claim fail.

### 1.    Reporting Unconstitutional Activity

23         As to reporting unconstitutional activity, Plaintiff indeed reported to Leahy on August

24  18, 2010 that he had been "removed as the project manager" for the ARCADIS team.

25

26         [13] The exclusion of Tompkins and Thomas from the ARCADIS team is not the "illegal and
    unconstitutional activity" at issue in this claim.  Although there is evidence that Plaintiff believed that
27  their exclusion was politically motivated, see Campbell Decl. Ex. E, Plaintiff nowhere argues that their
    exclusion was "illegal or unconstitutional," see Compl. ¶ 39.

28         [14] Plaintiff abandoned the only statutory claims that involve "opposing and reporting" illegal
    activity, for whistle-blower retaliation under the California False Claims Act.  See Opp'n at 1.

United States District Court
For the Northern District of California

See Campbell Decl. Ex. E ("No formal reason has been given for my removal but I believe that the root cause of jousting between Terry and myself was that I have continued to push for the retention of Mark Tompkins and Jeremy Thomas on the team, in part because we know that the request for their exclusion was driven by CH2M and in part because they add value to the team."). But there is no evidence that this report was the reason or even a reason that he was terminated.

To the contrary, the evidence is that Defendants decided to fire Plaintiff on August 17, 2010, Kamber Decl. ¶ 13, and that Kamber made several unsuccessful attempts to meet with Plaintiff and inform him of his termination beginning on August 17, 2010. Id. ¶ 15; see also Roth Decl. ¶ 13. Plaintiff can point to no evidence that Defendants decided to fire him after his report to Leahy, and there is no genuine dispute of fact on this point. See Anderson, 477 U.S. at 248-49 (issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party).

To the extent the wrongful termination claim is based on Plaintiff's reporting of his removal to Leahy, that claim therefore fails.

## 2.        Opposing Unconstitutional Activity

As to opposing unconstitutional activity, Plaintiff cannot demonstrate that it was his opposition, and not his insubordination, that led to his termination. In order to establish a *prima facie* case of wrongful discharge, a plaintiff must establish that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) there was a causal connection between the protected activity and the complained-of employment action. Anderson v. Union Pac. R. Co., No. S-06-2813, 2008 WL 2130320, at *9 (E.D. Cal. May 20, 2008) (applying McDonnell Douglas burden shifting scheme to wrongful termination action). Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to offer a legitimate, non-retaliatory reason for the adverse employment action. Id. If the employer does so, the inference of retaliation is overcome, and the plaintiff must then provide evidence to demonstrate that the legitimate reason proffered by the defendant is merely a pretext. Id.

15

Here, even assuming that Plaintiff has established a *prima facie* case that he was fired because he opposed his unconstitutional demotion, Defendants have offered a legitimate, non-retaliatory reason for his termination: insubordination.  A heap of evidence supports this articulated reason:

- Plaintiff reacted defensively and hung up on his supervisor, Roth, upon learning that he had been removed as the point-of-contact with DSC.  Roth Decl. ¶ 8.

- Roth instructed Plaintiff not to contact the DSC, id. ¶ 2, but Plaintiff did so anyway, sending an unauthorized draft of the report, and not copying Roth, id. Ex. 3.

- Plaintiff did not respond to Roth's attempts to contact him by telephone or email over the next two days.  Id. ¶ 10.

- Plaintiff sent a long email to an executive at ARCADIS, stating that Roth had been "hired by Dennis Kamber without checking his references and in spite of the warning I gave Dave Thomas."  Campbell Decl. Ex. D at RP 25.  It said that Roth was "not up to the job."  Id. at RP 27.  It also opined that Roth "has done essentially nothing in the months that he has been with the company, cannot reasonably be expected to do anything significant and is a waste of shareholders funds."  Id. at RP 28.

- Plaintiff emailed Roth and cc-ed other ARCADIS executives, stating, "I am under the impression that your role with the company is primarily to develop new opportunities, not to interfere in operations.  It is much more up to Dennis and Steven than it is me to assess your progress on developing new opportunities but it seems to me that you have much yet to accomplish in that regard."  Campbell Ex. H at ARCADIS 04.

- Plaintiff emailed an ARCADIS executive again, stating that Roth had been "a failure in his two jobs after leaving CH before joining ASCE (from which he was in fact forced out[)]."  Kamber Decl. Ex. 2.

- ARCADIS Senior Vice President Dennis Kamber stated in his declaration that Plaintiff's termination was particularly based on Plaintiff's "series of insubordinate and inappropriate communications with his supervisor Mr. Roth and other upper level management employees regarding Mr. Roth and other employees since August 10, and his insubordinate conduct toward Mr. Roth by disregarding and disobeying Mr. Roth's instructions" about contacting the Council.  Id.

- A contemporaneous email by Plaintiff expresses concern "that Dennis Kamber might be trying to terminate me to silence my criticism (not so much of him but of Larry Roth, who Dennis hired without proper vetting)."  Campbell Decl. Ex. G.

Because Defendants have sustained their burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination, the presumption of discrimination falls away.  See Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 356 (2000).  Plaintiff then must demonstrate that Defendants' proffered reasons are pretexts for discrimination, or offer any other evidence that the employer acted with a discriminatory motive.  Id.  A plaintiff must

United States District Court
For the Northern District of California

1   demonstrate pretext "by either [1] directly persuading the court that a discriminatory reason

2   more likely motivated the employer or [2] indirectly by showing that the employer's

3   proffered explanation is unworthy of credence."  Aragon v. Republic Silver State Disposal

4   Co., 292 F.3d 654, 658-59 (9th Cir. 2002) (internal quotation marks omitted).  "[V]ery little"

5   direct evidence of discriminatory motive is required, but if circumstantial evidence is offered,

6   such evidence has to be "specific" and "substantial" to create a triable issue.  Godwin v. Hunt

7   Wesson Inc., 150 F.3d 1217, 1222 (9th Cir. 1998); Little v. Windermere Relocation, Inc.,

8   301 F.3d 958, 971 (9th Cir. 2002).

9          Here, Plaintiff points to no direct evidence of pretext.  The only indirect evidence he

10   points to is that there is a temporal nexus of a few weeks between his complaints to

11   Macaulay and his removal on the one hand, and his termination on the other.  See Opp'n at

12   11.[15]  Although a temporal nexus can support an inference of retaliation, see Coszalter v. City

13   of Salem, 320 F.3d 968, 977 (9th Cir. 2003), here the temporal nexus, standing alone, is not

14   sufficiently "substantial" to create a triable issue.  See Godwin, 150 F.3d at 1222; see

15   also Contreras v. Suncast Corp., 237 F.3d 756, 765 (7th Cir. 2001) ("absent other evidence of

16   retaliation, a temporal relation is insufficient evidence to survive summary judgment");

17   Plemmons v. U.S. Bancorp, No. 04-5860, 2006 WL 290557, at *6 (W.D. Wash. Feb. 7,

18   2006) (granting summary judgment for defendant even where plaintiff established temporal

19   nexus; "coincidence is not proof of causation").  No doubt Plaintiff's removal was the event

20   that triggered his insubordinate emails; it is not mere "coincidence" that Plaintiff was

21   removed and then, just over a week later, terminated.  But that does not mean that Plaintiff

22   was terminated for discriminatory reasons.  See Carmen v. S.F. Unified Sch. Dist., 237 F.3d

23   1026, 1028 (9th Cir. 2001) ("A plaintiff's belief that a defendant acted from an unlawful

24   motive, without evidence supporting that belief, is no more than speculation or unfounded

25   accusation about whether the defendant really did not act from an unlawful motive.").

26

27

28          [15] Plaintiff also asserts that "Defendants expressed opposition to Pyke's speech," but he points
     to no evidence in support of that conclusion.  See Opp'n at 11

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    To the extent the wrongful termination claim is based on Plaintiff's opposing of his

2    removal, that claim therefore also fails.  Accordingly the Court GRANTS summary judgment

3    to Defendants on the wrongful termination claim.

4    **C.      COUNT SEVEN: FREE SPEECH**

5        Finally, Defendants move for summary judgment on Plaintiff's seventh cause of

6    action, Violation of Plaintiff's Civil Rights under 42 U.S.C. § 1983.  MSJ at 21-25.  That

7    cause of action alleges that Defendants violated Plaintiff's freedom of speech "by

8    terminating Plaintiff, depriving him of income from his job, and subjecting him to retaliation

9    by others in retaliation for and as prior restraint of protected speech regarding matters of

10   public importance."  Compl. ¶ 56.  Plaintiff explains in his Opposition that this cause of

11   action pertains <u>both</u> to Defendants' decision to terminate him, <u>and</u> to their earlier decision to

12   remove him as client contact.  <u>See</u> Opp'n at 7-8.[16]  This Order addresses each adverse

13   employment action in turn.

14   **1.      Plaintiff's Termination**

15       To establish a violation of section 1983, Plaintiff must demonstrate that (1)

16   Defendants acted under color of state law to deprive him of a right, (2) the right to which

17   Defendants deprived him was secured by the Constitution or laws of the United States.

18   <u>See</u> <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49 (1999).  Plaintiff's section 1983

19   claim fails as to his termination because there is no evidence that it was based on state action.

20       Private parties are ordinarily not subject to suit under section 1983, unless "sifting the

21   circumstances of the particular case, the state has so significantly involved itself in the

22   private conduct that the private parties may fairly be termed state actors."  <u>Robbins v.</u>

23   <u>Hamburger Home for Girls</u>, 32 Cal. App. 4th 671, 683 (1995).  Among the factors courts are

24

---

25   [16] Defendants argue that this cause of action is not worded broadly enough to include Plaintiff's
     removal.  <u>See</u> Reply at 11 (complaining that this is the first time Plaintiff made 1983 allegation as to his
26   removal).  However, the Court gives Plaintiff the benefit of the doubt and concludes that the cause of
     action does include removal, both because of its language about "subjecting him to retaliation by others"
27   and because the Complaint, elsewhere, discusses Plaintiff's removal, and Plaintiff incorporates all of
     the prior allegations into the section 1983 cause of action.  <u>See</u> Compl. ¶¶ 54, 56.  Accordingly, this
28   Order assumes that the 1983 claim is based, as Plaintiff asserts, both on Plaintiff's termination and on
     his removal.

to consider are whether the state "compelled or encouraged the particular conduct." Id. "Under the 'state compulsion test,' a private actor's conduct is attributable to the State when it exerts coercive power over the private entity or provides significant encouragement." See Cornish v. Corr. Servs. Corp., 402 F.3d 545, 549 (2005) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 170-71 (1970)). "To make the requisite showing of state action by a regulated entity, [a plaintiff] must establish a sufficiently close nexus between the State and the challenged action of the regulated entity." Id. at 550 (internal quotation marks omitted; emphasis in original).

Here, there is no evidence that the State was involved in Plaintiff's termination. The evidence is that the DSC, ARCADIS's client and a state agency, contacted Plaintiff's supervisor, Roth, and "requested that . . . Roth take over the point-of-contact responsibilities with the DSC in order to ease the frustration that [Macaulay] was experiencing with communications and attention to the staff's instructions." Macaulay Decl. ¶ 10. The State therefore "compelled or encouraged" Plaintiff's removal as client contact, but not his termination. See Robbins, 32 Cal. App. 4th at 683. Plaintiff argues that there is a "question of fact as to whether" Macaulay's encouragement that ARCADIS demote Plaintiff "also led to the decision to terminate [Plaintiff] shortly after," Opp'n at 9, but he points to no evidence that would create a dispute of fact on that issue. Moreover, even according to Plaintiff, his removal was to be temporary, which undermines the notion that the State intended Plaintiff's removal to lead to his termination. See Macaulay Decl. ¶ 11 (Roth agreed to take over as point-of-contact temporarily, and they agreed that Plaintiff would remain on the team in a technical role); Roth Decl. ¶ 8 (Roth told Plaintiff that the DSC had requested that Plaintiff be removed as point-of-contact, and that Roth had honored that request, at least temporarily); Roth Decl. Ex. 2 (Plaintiff replied that he had talked to Peter, another member of the team, and "we agreed that as a temporary work-around we can name Peter as the contact person.").

Because Plaintiff was not terminated as a result of state action, the Court GRANTS summary judgment on Plaintiff's section 1983 claim as to his termination.

//

**United States District Court**
For the Northern District of California

### 2.      Plaintiff's Removal as Client Contact

#### a.      Adverse Employment Action

As an initial matter, Defendants argue that Plaintiff's removal as client contact cannot be an adverse employment action sufficient to support a section 1983 claim.  <u>See</u> Reply at 11-12.  Defendants reason that there is "no allegation that any of the terms or conditions of Plaintiff's employment were affected," and that, taking Plaintiff's argument to its logical conclusion, any time a government consultant changed an employee's responsibilities, that would be an adverse employment action.  <u>Id.</u>  The Court is unpersuaded.

The Ninth Circuit takes "an expansive view of the type of actions that can be considered adverse employment actions."  <u>See</u> <u>Ray v. Henderson</u>, 217 F.3d 1234, 1241 (9th Cir. 2000).  "To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind.  Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden."  <u>Coszalter</u>, 320 F.3d at 975.  Although some would-be retaliatory actions are so insignificant that they do not constitute adverse employment actions, the Ninth Circuit has found that a lateral transfer qualifies.  <u>See</u> <u>Ray</u>, 217 F.3d at 1241 (citing <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987)).  The Circuit has explained that "the severity of an action's ultimate impact (such as loss of pay or status) goes to the issue of damages, not liability." <u>Ray</u>, 217 F.3d at 1243 (internal quotation marks omitted); <u>see also</u> <u>Hyland v. Wonder</u>, 972 F.2d 1129, 1135 (9th Cir. 1992) (loss of a volunteer position sufficient to trigger First Amendment protections).  Plaintiff's removal as client contact and his retention in a technical role, <u>see</u> Macaulay Decl. ¶ 11, is akin to a lateral transfer.  Plaintiff still had a job at ARCADIS, he still had the same pay and benefits, but his role was changed, and changed in a way that arguably decreased its status.  This is the kind of employment action that, when taken in response to an employee's exercise of free speech, is "reasonably likely to deter" the exercise of his First Amendment rights.  <u>See</u> <u>Coszalter</u>, 320 F.3d at 976.

Accordingly, Plaintiff's removal as client contact was an adverse employment action for the purposes of his 1983 claim.

20

**b.      State Action**

Additionally, as discussed above, the State did "compel[] or encourage[]" Plaintiff's removal as client contact.  See Robbins, 32 Cal. App. 4th at 683.  Plaintiff has therefore established state action.

**c.      Protected Speech**

Defendants argue that Plaintiff's speech was not constitutionally protected because it did not involve a matter of public concern.  MSJ at 23.[17]  Whether an employee's speech involves a matter of public concern depends on "the content, form, and context of a given statement, as revealed by the whole record."  Connick v. Myers, 461 U.S. 138, 147-48 (1983).  A public employee's speech deals with a matter of public concern when it "can be fairly considered as relating to a matter of political, social, or other concern to the community."  Voigt v. Savell, 70 F.3d 1552, 1559 (9th Cir. 1995).  Thus, "complaints over internal office affairs" are not protected speech, nor is speech dealing with "individual personnel disputes and grievances" and "information [that] would be of no relevance to the public's evaluation of the performance of governmental agencies."  See Nunez v. Davis, 169 F.3d 1222, 1227 (9th Cir. 1999); McKinley v. City of Elroy, 705 F.2d 1110, 1114 (1983).

The speech at issue here is Plaintiff's email to Macaulay about a week after ARCADIS's contract with DSC was finalized.  Plaintiff described this as "mov[ing] forward and adding personnel in five categories to the contract," including Thomas and Tompkins. Pyke Decl. (dkt. 41-1) ¶ 8.  He asserted in his declaration that he spelled out the reasons that Thomas and Tompkins "created no conflict," and why they were important to the team.  Id. Plaintiff used the phrase "I insist" in arguing that Thomas and Tompkins be added to the team.  Id.  Defendants characterized that speech in their papers and again at the motion hearing as relating to internal personnel matters and not any public concern.  See MSJ at 24. The Court disagrees.

//

---

[17] Notably, at the motion hearing, Defendants agreed that if Plaintiff's speech did involve a matter of public concern, Plaintiff should prevail on his 1983 claim.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Plaintiff's insistence that Thomas and Tompkins be included on the ARCADIS team was a matter of public concern for two reasons. First, Plaintiff asserts that Thomas and Tompkins were critical to the team's ability to serve the public because they were key to the "effects analysis," without which the BDCP would be unable to obtain incidental take permits – one of the BDCP's primary goals. See Pyke Decl. ¶ 3.[18][19] Second, there had already been a public "controversy" about the DSC's having hired CH2M Hill, because there were questions about CH2M Hill's independence. See Macaulay Decl. ¶¶ 3-4. The exclusion of Thomas and Tompkins from the ARCADIS team was ostensibly about ensuring that ARCADIS be an independent consultant, see Macaulay Decl. Ex. 1 (July 6, 2010 letter from Macaulay to Plaintiff: "These two individuals therefore do not meet the BDCP independence qualifications for this contract, and we request that you remove them from your team."), but Plaintiff argued that it actually illustrated CH2M Hill's improper influence over the DSC, see Campbell Ex. H at ARCADIS at 04 ("[i]f the legislature finds out that we are caving to staff and CH2MHill pressure, that will immediate[ly] reverse the reprieve from criticism that the Council has gotten by hiring us."); Campbell Decl. Ex. E ("No formal reason has been given for my removal but I believe that the root cause of jousting between Terry and myself was that I have continued to push for the retention of Mark Tompkins and Jeremy Thomas on the team, in part because we know that the request for their exclusion was driven by CH2M and in part because they add value to the team."). Given this context, the staffing of the ARCADIS team potentially impacted both the efficacy, and the perceived independence of, a public project. It cannot be said that such "information would be of no relevance to the public's evaluation of the performance of governmental agencies." See McKinley, 705 F.2d at 1114. Accordingly, the speech was of public concern.

---

[18] As the Court pointed out at the motion hearing, staffing can always be cast as bearing on the ultimate effectiveness of a project, and it cannot be the law that the staffing of a public project is therefore always an issue of public concern. Nonetheless, Plaintiff's counsel correctly noted that Plaintiff did not say that he should be given a particular role on the team, but that Thomas and Tompkins should be included. That Plaintiff's speech was therefore not about "further[ing his] own personal interests" is a legally meaningful distinction from typical staffing cases. See Nunez, 169 F.3d at 1227.

[19] Defendants answer that "the ARCADIS project proceeded effectively without the involvement of Tompkins and Thomas." See Reply at 8. That is not the test.

**United States District Court**
For the Northern District of California

Defendants argue that even if the speech did relate to a matter of public concern, the Court must weigh the interests of the employee, "as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." See MSJ at 24 (citing Nunez, 169 F.3d at 1228, quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). "The employer's interest outweighs the employee's interest in speaking on a matter of public concern if the employee's speech 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operations of the enterprise." Id.

There is no evidence that Plaintiff's speech about including Tompkins and Thomas on the team was disruptive. Defendants point to none in their briefing. In fact, Macaulay testified that she considered the issue "long closed" and did not respond to Plaintiff's email or communicate with him further about that staffing issue. Macaulay Decl. ¶ 7. "[R]eal, not imagined, disruption is required, and the 'close working relationship' exception cannot serve as a pretext for stifling legitimate speech." McKinley, 705 F.2d at 1115. Defendants cannot argue both that Plaintiff's speech had no impact on Macaulay and that it was so disruptive to his relationship with the DSC that it warranted his removal. Accordingly, the Court finds that the speech did involve a matter of public concern, and that it is entitled to protection even following a Pickering balancing analysis.

### d.    Nexus

A final issue for the Court to consider is whether there is a sufficient nexus between Plaintiff's statements and the reason he was removed as client contact. Defendants argue that "even if [Plaintiff's] complaints about the staffing of the project could somehow be characterized as a public concern, which they cannot, he was not fired for making those complaints. Indeed, he was not even removed as project point-of-contact for that reason; Macaulay considered the subject long closed well before she ever considered approaching Roth to have Pyke replaced as project manager." MSJ at 24-25.

23

1    Where both legitimate and mixed motives might have played a part in an adverse

2    employment action, "the ultimate inquiry is whether the employer 'would have reached the

3    same decision as to [the plaintiff's] [] employment even in the absence of the protected

4    conduct.'"  Gilbrook v. City of Westminster, 177 F.3d 849, 853 (9th Cir. 1999) (citing Mt.

5    Healthy City Sch. Dist. v. Doyle, 49 U.S. 274, 287 (1977)).  First, a plaintiff must

6    demonstrate that his or her conduct was constitutionally protected and was "a 'substantial' or

7    'motivating' factor in the defendant's employment decision."  Id.  If the plaintiff meets his

8    burden, the burden shifts to the defendant to demonstrate "by a preponderance of the

9    evidence that it would have reached the same decision . . . even in the absence of the

10    protected conduct."  Id.

11    Here, Defendants concede that one of the factors that drove Macaulay's request that

12    Plaintiff be removed as client contact was his demands as to staffing.  See Roth Decl. (dkt.

13    39) ¶ 39 ("Macaulay was concerned about [Plaintiff's] communication style and his

14    insistence that the DSC staff acquiesce to his demands regarding project issues such as

15    staffing, participation in meetings, and execution of the work.").  It is fair to conclude that

16    Plaintiff's insistence on including Thomas and Tompkins was a "motivating" factor for

17    Macaulay's request that Plaintiff be removed.  The Court finds that Plaintiff has thus met his

18    burden.

19    Have Defendants demonstrated that they would have reached the same decision even

20    absent Plaintiff's insistence on including Thomas and Tompkins?[20]  The Court thinks not.  If

21    the Court's focus was Plaintiff's termination, the Court would conclude that Defendants had

22    produced ample evidence that, in light of Plaintiff's insubordinate response to being

23    removed, Plaintiff would have been terminated anyway.  But because the Court's focus is

24    Plaintiff's removal, the subsequent insubordinate conduct is irrelevant.

25    Defendants' best evidence is Macaulay's declaration, in which she states that she

26    "almost immediately became concerned with [Plaintiff's] approach to project management.

27

28    _____

[20] Defendants do not address this issue in their Reply, instead relying on the argument that the removal is not an adverse employment action.  See Reply at 11-12.

1    His communication style was abrupt and dismissive to me and other members of the DSC

2    staff, and he had a view of the ARCADIS project that exceeded the scope" of what

3    ARCADIS had been asked to do.  Macaulay Decl. ¶ 9.  There is also the very concrete

4    example of Macaulay's frustration with Plaintiff's handling of a draft DSC staff report that

5    Macaulay believed needed a "major edit" and that Plaintiff told her "is the way it is."  Id. ¶

6    10; Ex. 3.  While this is certainly evidence that there were other reasons that Plaintiff was

7    removed as client contact, the Court cannot conclude that Defendants have shown <u>by a</u>

8    <u>preponderance of the evidence</u> that he would have been removed in the absence of the

9    Thomas/Tompkins staffing issue.  It is simply not clear how much that issue drove the

10   Defendants' decision.

11        Although it is a close question, in light of the burden on Defendants in the <u>Mt.</u>

12   <u>Healthy</u> test, and the requirement that the Court draw all reasonable inferences in favor of the

13   nonmoving party, <u>see</u> <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007), the Court concludes that

14   there is a sufficient nexus between Plaintiff's constitutionally protected statements and his

15   removal.  Accordingly, the Court DENIES summary judgment on Plaintiff's section 1983

16   claim <u>as to his removal only</u>.

17   **IV.   CONCLUSION**

18        For the foregoing reasons, the Court GRANTS the Motion for Summary Judgment as

19   to all claims but the section 1983 claim to the extent that it challenges Plaintiff's removal as

20   client contact.  The Court also DENIES Plaintiff's request for additional discovery.

21        **IT IS SO ORDERED.**

22

23   Dated: July 17, 2012

     _____
     CHARLES  R. BREYER
     UNITED STATES DISTRICT JUDGE

24

25

26

27

28