IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT PYKE, | |
|     Plaintiff, | No. C 11-1279 CRB |
| v. | **ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS** |
| ARCADIS, US INC., et al., | |
|     Defendants. | |

    Following the Court's denial in part of Defendant's Motion for Summary Judgment, see Order on Summary Judgment (dkt. 51), one of Plaintiff's claims under 42 U.S.C. § 1983 was set for trial. Because the parties raised an issue for trial that they did not address on summary judgment—whether Plaintiff spoke as a private citizen or public employee—the Court ordered supplemental briefing on the issue. Upon consideration of the parties' supplemental submissions and the entire record of the case, the Court concludes that Defendants are entitled to summary judgment, because there is no evidence that Plaintiff spoke as a private citizen, and his speech is therefore not entitled to First Amendment protection.

//
//
//
//

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff is an experienced geotechnical engineer with expertise in water resource management. Pyke Dep. (Campbell Decl. (dkt. 35) Ex. A) at 10:13-15. Defendant ARCADIS is the United States arm of one of the largest environmental consulting companies in the world. Barrett Decl. (dkt. 36) ¶ 3. Plaintiff started working for ARCADIS in August 2008, and spent a substantial percentage of his time on ARCADIS's efforts to build its water resources practices in California. Pyke Dep. at 21:4; Kamber Decl. (dkt. 37) ¶ 5. In April 2010, when ARCADIS hired Larry Roth to manage the development of ARCADIS's water resources practice, Plaintiff began reporting to him. Id. ¶ 7.

In July 2010, the Delta Stewardship Council ("DSC" or "the Council"), a state agency focused on water management in California, entered into a major consulting engagement with ARCADIS. See generally Macaulay Decl. (dkt. 38). DSC initially hired a company called CH2M Hill to assist it in developing a comprehensive Delta Plan, but that selection created a controversy because CH2M Hill was a contractor on the ongoing preparation of the "Bay Delta Conservation Plan" ("BDCP"), which the DSC was evaluating for possible inclusion in the new overall Delta Plan. Id. ¶¶ 3-4. In response to that controversy, DSC decided to engage a second, "independent" consultant with no prior involvement with the BDCP to review the BDCP on the DSC's behalf. Id. ¶ 4. The DSC requested statements of qualifications ("SOQs") from firms interested in winning the consulting contract. Plaintiff "assembled a team of engineers and scientists and directed the preparation of an SOQ that was submitted on ARCADIS's behalf." Pyke Decl. (dkt. 95-1) ¶ 12; Ex. A ("SOQ").

In reviewing ARCADIS's bid to be an independent consultant to the DSC, Terry Macaulay, the Supervising Sanitary Engineer for the DSC, asked the CH2M Hill project manager to review a list of proposed ARCADIS personnel for prior BDCP involvement.

---

[1] Because the Order on Summary Judgment set forth the facts surrounding Plaintiff's employment detail, (see Summ. J. at 1-8), the Court will restate only the facts relevant to the present issue.

2

Macaulay Decl. ¶ 5. CH2M Hill identified two individuals—Mark Tompkins and Jeremy Thomas—as having been involved in the development of the BDCP when they had previously worked for CH2M Hill. Id.

At the same time that she notified ARCADIS that it was selected to serve as the independent consultant, Macaulay informed ARCADIS that Tompkins and Thomas could not be involved in the project. Id.; Macaulay Decl. Ex. 1 (July 6, 2010 letter from Macaulay to Plaintiff: "These two individuals therefore do not meet the BDCP independence qualifications for this contract, and we request that you remove them from your team."); Pyke Decl. ¶ 17. Plaintiff did not agree that Tompkins and Thomas had a conflict of interest. Instead,

> [Plaintiff] was certain that this objection [to Tompkins and Thomas] was a pretext, and that the real reason Ms. Macaulay did not want either of these scientists working on ARCADIS's team was because they were among the most qualified and capable people on earth to understand and evaluate whether the BDCP had conducted its effects analysis correctly or was, instead, trying to hide something. [Plaintiff] was equally certain there was no conflict because Dr. Tompkins's and Mr. Thomas's work for CH2M Hill had been limited to the preliminary gathering of data, before any analysis was actually conducted. They were therefore uniquely well situated to evaluate whether CH2M Hill had properly analyzed the data that was available to it, or had discarded relevant data because it did not conform to the conclusions it wished to present. Further, both men had left CH2M Hill some months earlier and were now in competition with their former employer. Thus, any assertion that a conflict of interest existed was utterly unfounded and any competent person would immediately recognize that fact.

Pyke Decl. ¶ 17. Plaintiff requested a meeting with Macaulay to discuss Tompkins's and Thomas's inclusion on the team. When Plaintiff started to explain his view that they did not pose a conflict of interest, Macaulay "cut [him] off and said 'but you will exclude them, won't you, or words to that effect.'" Id. ¶ 18. In response, Plaintiff agreed to submit the contract paperwork including only current ARCADIS employees and said he "would raise the issue of additional personnel after the contract was signed." Id.; see also Pyke Dep. at 104:4-5 ("I indicated that we'd leave them off the initial submittal."). Plaintiff did not tell Macaulay that he intended to ask for them to be added back to the team at a later point. Pyke Dep. at 104:6-11; see also Macaulay Decl. ¶ 6 ("[Plaintiff] agreed to proceed with the contract without Mr. Thomas and Mr. Tompkins, and I understood the matter was closed.").

According to Plaintiff, he then

> formed the belief that [he] would be unable to evaluate thoroughly the validity of the BDCP's effects analysis, and that the public interest and the interest of the Council itself (as opposed to the political interests of the [Council] Staff), would be compromised if Dr. Tompkins and Mr. Thomas were excluded from the ARCADIS team.  Therefore, on July 21, 2010, after the initial set or personnel had been approved and the first Task Order issued, when [Plaintiff] e-mailed Ms. Macaulay about the need to add additional staff members in five different categories, he [sic] spelled out in detail the reasons why there was in fact no conflict of interest and "insisted" that Dr. Tompkins and Mr. Thomas be restored to the team.

Pyke Decl. ¶ 19; see 7/21/10 email (Pyke Decl., Ex. B) at 2 ("Although I agreed not to push the matter when we first met with you, I now have to insist that they be restored to the team.").  Plaintiff states that he did not seek Roth's approval before sending the email "partly because [he] believed [he] would not get it."  Pyke Decl. ¶ 20.  According to Plaintiff, after learning of the email, Roth called and "upbraided" him, "saying in a raised voice words to the effect that I had exceeded both my authority and ARCADIS's authority under [its] contract with the Council and would 'make an enemy' out of Ms. Macaulay."  Id. ¶ 21.

On August 8, 2010, Plaintiff sent Macaulay a draft DSC staff report that Macaulay believed needed a "major edit" and "demonstrated a lack of awareness of the intended audience and purpose for the report, and did not reflect the staff's direction or instruction for its contents."  Id. ¶ 10; Ex. 3. Plaintiff sent a revised draft, acknowledging that the tone of the report was "a little bold" but stating, "this is the way it is."  Id.  Plaintiff sent another draft, which Macaulay felt "also reflect[ed] an inflexible and strident tone," and Macaulay concluded that Plaintiff "could not, or would not, draft the staff report consistent with the direction and expectations of the DSC staff" on whose behalf the report was written.  Macaulay Decl. ¶ 10.  According to Plaintiff, this memorandum was unsolicited by the Council and not intended to be the draft report Macaulay understood it to be.  Pyke Decl. at ¶¶ 23-24.

On August 10, 2010, Macaulay contacted Roth and "requested that . . . Roth take over the point-of-contact responsibilities with the DSC in order to ease the frustration that [Macaulay] was experiencing with communications and attention to the staff's instructions."  Macaulay Decl. ¶ 11.  As Roth describes the call, "Macaulay was concerned about

4

[Plaintiff's] communication style and his insistence that the DSC staff acquiesce to his demands regarding project issues such as staffing, participation in meetings, and execution of the work. In particular, [Macaulay] expressed her frustration that [Plaintiff] seemed unable or unwilling to follow her instructions and incorporate her review comments" on the report. Roth Decl. (dkt. 39) ¶ 39.  Roth agreed to take over as point-of-contact temporarily, and they agreed that Plaintiff would remain on the team in a technical role.  Macaulay Decl. ¶ 11.

### B. Procedural History

The Court granted Defendants' motion for summary judgment on six of Plaintiff's causes of action: (1) Fraud and Deceit; (2) Breach of Contract; (3) Breach of the Covenant of Good Faith and Fair Dealing; (4) Wrongful Termination in Violation of Public Policy; (5) Wrongful Termination in Violation of Statute (Government Code Section § 12650 and Labor Code Section 1102.5); and (6) Negligence Per Se. Id. at 13-18.  As for Plaintiff's seventh cause of action, for First Amendment retaliation under 42 U.S.C. § 1983, the Court concluded that Plaintiff was not terminated as a result of state action and granted summary judgment for Defendants. Id. at 19.  The Court denied summary judgment, however, on the grounds that Plaintiff's speech involved a matter of public concern and there was a sufficient nexus between Plaintiff's statements and his removal as client contact with the Council. Id. at 23, 25.

In their Proposed Pretrial Order, the parties stipulated that one of the factual issues remaining in the case is whether

> When Dr. Pyke wrote an email to Terry Macaulay stating that he insisted that Mr. Thomas and Mr. Tompkins be permitted to work on the ARCADIS team contracted as an independent consultant to the Delta Stewardship Council, was he speaking as a public citizen or as part of his duties with ARCADIS?

Proposed Pretrial Order (dkt. 82) at 6.  The parties also stipulated to a jury instruction that reads:

> The plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not as part of his official duties. Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform.

5

Proposed Jury Instruction, Stipulated Instruction No. 6 (dkt. 84 at 11) (citing Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. Cal. 2009)).

These issues reflect the correct standard for §1983 claims asserting First Amendment retaliation following the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006). The Ninth Circuit has incorporated the Court's holding in Garcetti in the Pickering balancing test and articulated a five-part inquiry for claims like Pyke's:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Dahlia v. Rodriguez, 735 F.3d 1060, 1067 (9th Cir. 2013) (en banc) (quoting Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009)). "[A]ll the factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's case." Id. at 1067, n.4.

Despite the correct statements of law in their pretrial submissions, neither party directly addressed in their summary judgment briefing the issue of whether Plaintiff spoke as a private citizen or a public employee. Because Plaintiff must prove that he spoke as a public citizen in order to prove his case, see id., the Court ordered the parties to file supplemental briefing addressing the Pickering standard as articulated in Dahlia. (dkt. 94).

## II. LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). The burden is on the moving party to demonstrate that there is no genuine dispute with respect to any material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

1  A court must view the evidence in the light most favorable to the non-moving party and draw
2  all justifiable inferences in its favor. Anderson, 477 U.S. at 255. "Where the record taken as
3  a whole could not lead a rational trier of fact to find for the non-moving party, there is no
4  'genuine issue for trial.'" Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587
5  (1986).

## III. DISCUSSION

### A. The First Amendment Does Not Protect a Public Employee's Speech Made Pursuant to Official Duties

In Garcetti v. Ceballos, the Supreme Court distinguished between speech made as a private citizen and speech made pursuant to official duties. 547 U.S. 410. Ceballos, a calendar deputy in the Los Angeles County District Attorney's Office, was asked by a defense attorney to investigate a particular case because he believed there were inaccuracies in the affidavit supporting the search warrant. Id. at 413-14. Having "determined that the affidavit contained serious misrepresentations," Ceballos wrote a memorandum to his supervisor that "explained [his] concerns and recommended dismissal of case." Id. at 414. Ceballos was then "reassign[ed] from his calendar deputy position to a trial deputy position, transfer[ed] to another courthouse, and deni[ed] a promotion." Id. at 415.

Considering Ceballos's § 1983 claim for First Amendment retaliation, the Court concluded that the "controlling factor" was "that his expressions were made pursuant to his duties as a calendar deputy." Id. at 421. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. Because "writing a memo that addressed the proper disposition of a pending criminal case," was part of "his daily professional activities" and one of "the tasks he was paid to perform," Ceballos was acting as a government employee, not a private citizen, and his speech was not protected by the First Amendment. Id. at 422.

In Dahlia v. Rodriguez, the Ninth Circuit offered non-exclusive list of "a few guiding principles" for determining whether an employee spoke as a private citizen or public

7

employee for the purposes of a First Amendment retaliation claim. 735 F.3d at 1074. First, "whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties." Id. Second, "the subject matter of the communication is . . . highly relevant to the ultimate determination whether the speech is protected by the First Amendment." Id. at 1074–75. "When an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties." Id. at 1075. "By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct." Id. Third, the Ninth Circuit found that "when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties." Id.

### B. Plaintiff Spoke as a Public Employee

"While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law. Eng v. Cooley, 552 F.3d 1062, 1071 (9th Cir. 2009) (internal quotation marks omitted). The parties do not dispute Plaintiff's employment duties as ARCADIS's client contact and project manager for the DSC project. The only dispute is whether Plaintiff's speech—specifically his email to Macaulay on July 21, 2010[2]—was made in the course of those duties. Applying the principles the Ninth Circuit articulated in Dahlia to the facts at hand, the Court concludes that the "ultimate constitutional significance" of those undisputed facts is that Plaintiff's speech was made pursuant to his official duties as a public employee.

First, Plaintiff's email was confined to his chain of command. See Pyke Decl. Ex. B

---

[2] To the extent Plaintiff attempts for the first time in his Supplemental Brief to rely on his August 8, 2010 memoranda as speech in support of his claim, the Court similarly finds that he wrote the memoranda as part of his official duties.

at 1. The email was part of an ongoing string of emails about the project subject "Assignment of 46-8890 - TO# 006 - CH2MHill - Delta Council," beginning on July 12, 2010, when Macaulay emailed Plaintiff to prepare a detailed draft budget of the project's task order for her review. See Pyke Decl. Ex. B at 3. After exchanging several more emails about staffing in the budget, Plaintiff sent Macaulay the email in which he stated that he would have "to insist that [Tompkins and Thomas] be restored to the team." Id. at 2. The string of emails indicates that Macaulay was in Plaintiff's chain of command with regards to the staffing of the project. Plaintiff copied three other individuals on the email: his supervisor Larry Roth, and two other ARCADIS team members, Peter Wljsman and Liz Sewell. Id.; SOQ, App. A.

As such, Plaintiff's speech is analogous to the memorandum Ceballos sent to his supervisor in Garcetti, which the Supreme Court found was part of his daily professional duties as a government employee. 547 U.S. at 421; see also Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006) (holding that plaintiff acted pursuant to her official duties as a correctional officer when submitting forms about misconduct to her superiors, but as a private citizen in communications about the same issues with a state senator and the California Inspector General); Dowell v. Contra Costa Cnty., 12-CV-05743-JCS, 2014 WL 630909, at *4 (N.D. Cal. Feb. 18, 2014) (finding no dispute that an email sent only to plaintiff's superior was confined to her chain of command). In contrast, there is no indication that anyone outside of DSC or ARCADIS was made aware of the views Plaintiff expressed in his email. Compare, e.g., Ellins v. City of Sierra Madre, 710 F.3d 1049, 1059-60 (9th Cir. 2013) (finding it reasonable for jury to conclude police offer spoke as private citizen when acting as a union representative and president of the police association); Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1071-72 (9th Cir. 2012) (holding that employee spoke as a private citizen when subpoenaed to give deposition testimony about work-related matters); Marable v. Nitchman, 511 F.3d 924, 932-33 (9th Cir. 2007) (holding that plaintiff, chief engineer on a ferry, did not speak pursuant to his official duties when alleging his superiors were engaged in corruption).

Second, the subject matter of Plaintiff's email was typical of his job duties. Plaintiff "assembled a team of engineers and scientists and directed the preparation of an SOQ that was submitted on ARCADIS's behalf" to the DSC. Pyke Decl. ¶ 12; see SOQ. In the SOQ, Plaintiff is designated as DSC's point of contact and the project manager. *See* SOQ at 2, 13 As illustrated by his July 21, 2010 email identifying five personnel issues, Plaintiff was responsible for ensuring that the project was staffed properly. Plaintiff explains in detail why he believed the effects analysis was necessary to the project and why Thomas and Tompkins were necessary for the effects analysis. Pyke Decl. ¶¶ 14, 16. It is undisputed that he emailed Macaulay about including Tompkins and Thomas on the team because her approval was required for them to be paid. Pyke Dep. At 106:17-107:1; Pyke Decl. Ex. B ("I now have to raise the need to add additional personnel."). The email did not voice any broad concerns about the handling of the project in general; rather it expressed a very specific concern about a particular aspect of the project. See Dowell, 2014 WL 630909, at *4 (finding that plaintiff's email responding to a specific question about the use of grant funds was typical of her job duties as manager of two grants, not raising "broad concerns about corruption or systemic abuse.") (quoting Dahlia, 735 F.3d at 1075).

Third, Plaintiff did not speak in contravention of his supervisor when he insisted that Tompkins and Thomas be included on the team. Plaintiff states that he "did not seek Larry Roth's approval before sending his July 21, 2010 email to Ms. Macaulay partly because I believed I would not get it." Pyke Decl. ¶ 20. Whether Plaintiff believed Roth would approve of the email or not, the fact is that Roth had not ordered him not to send the email. Moreover, Plaintiff testified at his deposition that Roth "did not supervise or manage [Plaintiff's] activities on a day-to-day basis." Pyke Dep. at 127: 24-25. In Plaintiff's view, he only reported to Roth "in an administrative sense,"—that is, in the way "everyone has to report to someone to sign off on their time records." Id. at 128: 1-4. To the extent Plaintiff attempts to suggest he was required to have Roth's approval of the email before sending it, Plaintiff cannot create an issue of fact by contradicting his deposition testimony. See Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012).

In sum, the Court finds no genuine issue of material fact as to whether Plaintiff's speech was made pursuant to his official duties and that no reasonable jury could find that he speaking as a private citizen. Accordingly, Plaintiff's First Amendment retaliation claim fails. Dahlia, 735 F.3d at 1067 n.4 ("failure to meet any one of [the Eng factors] is fatal to the plaintiff's case.").

**IV. CONCLUSION**

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's remaining claim under 42 U.S.C. § 1983.

**IT IS SO ORDERED.**

Dated: March 31, 2014

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE